IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY RACHELLS, | ) | CASE NO. 1:08-CV-2815 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE LESLEY WELLS |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS EMPLOYEE | ) | |
| EMPLOYEE SERVICES, LLC, *et al,* | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |

Before the Court is Defendants' *Motion for Summary Judgment*.  (Doc. 19).  This motion

is before the Magistrate Judge pursuant to the referral order of Judge Lesley Wells.  (Doc. 30).

As explained more fully below, the undersigned recommends that the Motion for Summary

Judgment be **GRANTED**.

I. RELEVANT FACTS & BACKGROUND[1]

Plaintiff, Anthony Rachells ("Rachells" or "Plaintiff"), brought this action pursuant to

violations of the Ohio Revised Code and Federal law for race discrimination following his

termination from Defendant Cingular Wireless Employee Services, LLC, *et al* (herein referred to

as "Cingular").  (Doc. 4 at ¶¶ 8-10, 12).  Rachells, an African-American male, began working for

Ameritech as a sales representative in 1996.  (Doc. 28-2 ("Rachells Aff.") at ¶ 4; Doc. 20

("Def.'s Stmt of Facts") at ¶ 5).  Eventually, Plaintiff was promoted to the position of an account

---

[1] Only facts necessary for resolution of the present motion are included herein.  Unless otherwise
stated, the facts are taken from Defendants' statement of undisputed facts, to which Plaintiff
offered no counter-statement other than via random assertions throughout his brief in opposition.

manager for Ameritech's Indirect Channel division.  (Rachells Aff. at ¶ 7).  This division was comprised of agents, who were not owned or operated by Ameritech, but sold its products and services, (*Id*. at ¶ 8), as compared to the Direct Channel division, which was comprised of agents who were owned by Ameritech and sold its products.  (*Id*. at ¶ 9).  At some point, Ameritech was acquired by SBC Communications, Inc.  (Def.'s Stmt of Facts at ¶ 5).  Then, in 2000, SBC Communications, Inc. and Bellsouth Corporation entered into a joint venture and formed Cingular.  (*Id*. at ¶ 1; Rachells Aff. at ¶ 12).

Plaintiff maintained employment with the company throughout these changes, and avers that he began working as a National Retail Account Executive in Cingular's Indirect Channel in the Spring of 2000.  (Rachells Aff. at ¶ 16).[2]  Rachells alleges that he actually launched Cingular's Indirect Channel by himself without the assistance of any co-workers.  (*Id*. at ¶ 17). He further claims that his efforts were so successful that the Indirect Channel became almost as successful as the Direct Channel.  (*Id*. at ¶¶ 18, 9).  Plaintiff's salary was calculated based upon the sum of his "base salary" and his "at risk salary" or sales commission.  (*Id*. at ¶¶ 42-43).  He would only receive his "at risk salary" if he achieved 100% of his attainment percentage goal each month.  (*Id*. at ¶ 44).

During his tenure at the newly formed Cingular, Plaintiff was initially managed by Dale Zerner until July 2002.  (*Id*. at ¶ 59; Def.'s Stmt of Facts at ¶ 7).  Subsequently, Leisa Zang served as his supervisor, and eventually, Plaintiff reported to Keith Hart ("Hart") from 2003 until

---

[2]  Defendants contend that Plaintiff began working as an Indirect Account Executive with Cingular's Indirect Sales Channel in or around December 2001.  (Def.'s Stmt of Facts at ¶ 6). Plaintiff labels the position as a "National Retail Account Executive" while Defendant refers to it as an "Indirect Account Executive".  For the sake of clarity, the undersigned will use the term "National Retail Account Executive".

his termination in 2005. (Rachells Aff. at ¶ 59; Def.'s Stmt of Facts at ¶¶ 8-9).[3] David Fine ("Fine"), a Caucasian male, became the Director of the Indirect Channel in May 2001. (Rachells Aff. at ¶ 21).

Rachells asserts that he was very successful during his tenure at Cingular. For example, he received the Cingular Summit Winner award, "an accolade bestowed yearly to individuals from Cingular who had the highest attainment percentage of sales in the entire country." (Id. at ¶ 58). As a result of winning this award, Rachells received a trophy and a trip to San Diego, California. (Id.) In addition, Plaintiff earned the Indirect Manager of the Year award as well as the Indirect Manager of the Quarter award for all four quarters in 2001. (Id.) Finally, in 2001 Plaintiff also received an award from the Above and Beyond Club, which recognized employees in the Cleveland Market[4] for excellent customer service. (Id.) Rachells also received the highest 2003 performance evaluation score of his three peers at Cingular: Cheryl Patteson (Caucasian female), John Stokes (Caucasian male), and Joseph Christopher (Caucasian male) (collectively referred to as the "Cingular peers" or "Cingular candidates").[5] (Pl.'s Ex. 6 at 3; Rachells Aff. at ¶¶ 23-27; compare Doc. 20-14 ("Def.'s Ex. N") at 11-12 with Doc. 20-8 at 2-5, Doc. 20-9 at 2-4 & Doc. 20-10 at 2-5).[6] But, Plaintiff claims that during a meeting between he and Hart to discuss his 2003 performance evaluation, Hart mentioned that he believed Dave Fine "ha[d] it in" for Rachells, but that Hart did not know why. (Pl.'s Ex. 6 at 3; Rachells Aff. at ¶ 77).

---

[3] The parties disagree as to the timing of how long Leisa Zang managed Plaintiff and as to when Keith Hart began to manage Plaintiff. (Compare Rachells Aff. at ¶ 59 with Def.'s Stmt of Facts at ¶¶ 8-9).

[4] The Cleveland Market included the areas of Akron, Canton, Youngstown, Warren and Sandusky. (Rachells Aff. at ¶ 14).

[5] Plaintiff claims that Joseph Christopher did not become a National Retail Account Executive until approximately August 2004. (Rachells Aff. at ¶ 28).

[6] The Court notes that portions of Plaintiff's 2003 performance evaluation are missing from Defendants' exhibits. The impact of this omission will be addressed later in the Court's opinion.

Around October 2004, Cingular acquired AT&T Wireless Services, Inc. ("AT&T"). (Def.'s Stmt of Facts at ¶ 1).  Subsequently, in approximately December 2004, Cingular's senior leadership directed its management teams to realign its workforce in light of the recent acquisition.  (Doc. 20-1 ("Mendolia Aff.") at ¶ 5).  Each leader was directed to "(1) evaluate[] current business trends and results in their respective areas of responsibility; (2) evaluate[] staffing levels within the combined Cingular and AT&T Wireless workforce; and (3) determine[] the appropriate staffing levels based on projected business goals."  (*Id*.)  This realignment process led to the elimination of numerous jobs within Cingular affecting workers across the country (herein referred to as the "reduction in force" or the "RIF").  (*Id*. at ¶ 6).

In this case, the Vice President and General Manager of Cingular's Ohio and Western Pennsylvania market directed Fine to review the productivity of the Cingular and AT&T Indirect Account teams.  (Mendolia Aff. at ¶¶ 11-13).  In addition to the four National Retail Account Executives already employed with Cingular, AT&T had five individuals working in the same capacity: Joel Espiritu (Hispanic male), Ryan Keane (Caucasian male), Edwin Morales (Hispanic male), Marie Lavender (Caucasian female), and Francine Alexander (Caucasian female) (collectively referred to as the "AT&T candidates").  (*Id*. at ¶ 13; Def.'s Stmt of Facts at ¶ 24).  Fine used the guidelines set forth in Cingular's Indirect Span of Control Recommendation, (Doc. 20-5), to examine the productivity levels within the Northern Ohio sub-market, and determined that it was only necessary to retain four of the nine National Retail Account Executives currently employed between the two companies.  (Mendolia Aff. at ¶ 14).

Hart was charged with the duty of evaluating all nine candidates and ranking them in order to identify the most qualified employees to be retained by Cingular (hereinafter referred to as the "RIF selection process").  (*Id*. at ¶ 15).  He utilized the Staffing Integration Guidelines for

4

Human Resources and Managers, (Doc. 20-6), as a guide to evaluate and rate each candidate. (*Id*.)  Hart's evaluation of each candidate was based on two components.  (*Id*. at ¶¶ 16-17; Def.'s Stmt of Facts at ¶¶ 19-20).  The employee's 2004 performance evaluation score was the first factor considered.  (Mendolia Aff. at ¶ 16; Def.'s Stmt of Facts at ¶ 19).  Hart considered the 2004 performance reviews that he completed rating each of the four Cingular candidates which he managed.[7]  (Mendolia Aff. at ¶ 16).  Because he did not supervise the AT&T candidates, Hart consulted with David Gannon, their former manager at AT&T, to discuss their abilities and contributions vis-à-vis their future performance.  (*Id*.)

The second component used to rate each of the candidates was derived from scores Hart assigned to questions answered by the candidates during one-on-one interviews with Hart (the "RIF interview score").  (*Id*. at ¶ 20).  The interview questions were selected from a Staffing Integration Selection Guide ("SISG") given to Hart, which Defendants allege were similar to the guidelines dispersed throughout the company nationally.  *See* (Def.'s Ex. F at 12-15; Mendolia Aff. at ¶ 15).  Hart used the Staffing Integration Selection Guide to rate each employee in the following categories:  1) Create Customer Loyalty; 2) Drive For Results; and 3) Use Sound Judgment.  (Def.'s Ex. F at 12-15).  For each category, the employee was assigned a score between "5" representing that the candidate "consistently exceed[ed] performance objectives/behavioral expectations", and "1" indicating that the candidate "d[id] not meet basic performance objectives/behavioral expectations".  (Def.'s Ex. N at 6).  After rating each of the

---

[7] It is not clear when Hart completed the Cingular candidates' 2004 annual reviews because they are not dated, neither did the parties provide this information to the Court. (Def.'s Ex. H at 11-14; Def.'s Ex. I at 10-12; Def.'s Ex. J at 11-14; and Def.'s Ex. N at 7-10).

candidates under this two-part rubric,[8] Hart submitted his findings to Fine for final approval. (Mendolia Aff. at ¶ 19).

With regard to Rachells's 2004 annual review, Hart assigned Plaintiff an overall score of 2.6 for his performance during the year.  (Def.'s Ex. N at 7).  This was the lowest performance score received by any of the nine indirect account executives between Cingular and AT&T in 2004.  (Mendolia Aff. at ¶ 25).  Hart indicated that Rachells, *inter alia*, showed up late for meetings, worked on fantasy football during a "boot camp" training session, and failed to contribute in staff meetings.  (*Id*.; Def.'s Ex. N at 8-9).

Plaintiff denies these allegations.  He avers that his 2004 performance evaluation was "bogus" and that it was subjective and racially motivated.  (Rachells Aff. at ¶ 97).  Rachells submits that he cannot recall a time when he showed up late to a meeting, but that it is possible. (*Id*. at ¶ 63).  He also denies working on any fantasy football during meetings, but instead, alleges that he and Christopher merely read the fantasy football book during breaks.  (*Id*. at ¶ 70). Furthermore, he states that although Hart questioned him regarding this activity, Hart did not question Christopher.[9]  (*Id*. at ¶¶ 71-72).  Finally, Plaintiff alleges that he actively participated in staff meetings.  (*Id.* at ¶¶ 74-75).

With regard to Rachells's RIF interview, he alleges that he was the first of the Cingular candidates to be interviewed, and that he had never been informed of what the interviewing process would entail.  (Rachells Aff. at ¶¶ 91, 96).  However, Defendants assert that Plaintiff was aware that the purpose of the interview was to determine whether he would retain his position

---

[8] In addition to considering the candidate's 2004 performance review score and RIF interview score, Defendants allege that Hart also looked at the employee's "(1) previous performance evaluations; (2) Code of Conduct/disciplinary record; and (3) client and/or peer feedback." (Mendolia Aff. at ¶ 18).

[9] Plaintiff's deposition testimony contradicted this statement.  In his deposition, he testified that he was not sure whether Hart addressed this matter with Christopher.  (Doc. 20-2 ("Rachells Depo.") at 134).

with Cingular.  (Def.'s Stmt of Facts at ¶ 21).  Defendants also highlight that of the Cingular candidates, Plaintiff was the only person who did not prepare a presentation for the RIF interview.[10]  (*Id*.)  Rachells agrees that Hart asked him questions consistent with those appearing in his SISG, and that the interview was not recorded.  (*Id*. at ¶¶ 90, 92).  Plaintiff believed the interview went well, because his "[a]gents liked and respected [him]" and because he had "spent a great deal of [his] time at Cingular nurturing good relationships with [his] [a]gents and their employees".  (*Id*. at ¶¶ 93-94).

Hart assigned Rachells a score of 2 out of 5 in the areas of "Create Customer Loyalty" and "Drive For Results", and 3 out of 5 in the area of "Use Sound Judgment".  (Def.'s Ex. N at 6).  Plaintiff insists that these scores are racially biased.  (Rachells Aff. at ¶¶ 98-109).  He avers that this bias is revealed in the evidence Defendant submitted in support of its motion. Defendants' copy of the SISG from Rachells's interview does not, on its face, reflect that Rachells was interviewed in the area of "Drive For Results."[11]  (*Id*. at ¶ 98; *see* Def.'s Ex. N at 2-5).  Instead, Plaintiff alleges that Hart interviewed him twice in the area of "Create Customer Loyalty",[12] whereas all eight remaining candidates were interviewed in all three areas as reflected in their SISGs.  (*See* Def.'s Exs. H, I, J, K, L, M, N, O, P).

In the finality of the RIF selection process, Rachells's combined score ranked him seventh among the nine candidates.  (Mendolia Aff. at ¶ 20).   On the other hand, Plaintiff's Cingular peers, all Caucasian, received the highest three scores and were selected to remain with Cingular.  (*Id*. at ¶¶ 20-21).  An AT&T candidate, Joseph Espiritu, a Hispanic male, ranked fourth among the nine candidates and was selected as the fourth and final National Retail

---

[10] None of the AT&T candidates prepared presentations.
[11] Plaintiff indicated that this error appeared in his 2004 performance evaluation, (Rachells Aff. at ¶¶ 97-108), but from a review of the record, it is clear that he was actually referring to the SISG Hart completed during his interview.
[12] Defendant contests Plaintiff's allegations. The Court will address this issue in its opinion.

Account Executive to remain with Cingular.  (*Id*.)  Defendant maintains that its ultimate goal was to select the four most qualified candidates, "i.e. those who possessed the strongest skills, abilities, and experience", to remain with the company.  (*Id*. at ¶ 21).  The five employees not selected included two Caucasian females, one Caucasian male, one Hispanic male and Plaintiff.  (*Id*. at ¶ 24).

In February 2005, Cingular notified Rachells of his termination to be effective April 15, 2005.  (*Id*. at ¶ 26; Rachells Aff. at ¶ 116).  Days later, on February 17, 2005, Rachells sent a letter to two Cingular employees, Ms. Priebe and Mr. Robinson,[13] expressing his frustration with not being selected to remain with Cingular.  (Pl.'s Ex. 6).  The letter also detailed Plaintiff's alleged prior experiences of racial discrimination during his tenure with the company.  (*Id*.; Rachells Aff. at ¶ 118).  Defendants allege that this letter represented the first time that Plaintiff had ever raised the issue of race as a factor in any of the alleged discriminatory action that Plaintiff suffered, (Mendolia Aff. at ¶ 27), but, Plaintiff strongly disagrees arguing that he made the company aware of these problems back in 2003.  (Rachells Aff. at ¶ 124).  On March 25, 2005, Karen Mendolia, a Senior Human Resource Manager, responded to Plaintiff's letter.  (*Id*.; Doc. 20-18).  In her letter, Mendolia acknowledged learning of Plaintiff's letter to Ms. Priebe, but declined to comment upon the incidents referenced in Plaintiff's letter concerning events which occurred prior to the RIF, stating that they had been previously investigated and resolved by the company.  (Mendolia Aff. at ¶ 24; Doc. 28-15 at 2).   Instead, Mendolia explained that she had conducted an investigation centered upon the employment decisions made as a result of Cingular's RIF selection process, and concluded that the selection process was completed as objectively as possible and that the company's decisions were not made on the basis of race or any other protected category.  (Doc. 28-15 at 2).

---

[13] The record does not reflect what position these individuals held with the company.

Shortly after his departure from Cingular, Plaintiff filed a Charge of Discrimination complaint with the Ohio Civil Rights Commission.  (Doc. 20-19 at 2).   However, on July 12, 2005, the Equal Employment Opportunity Commission dismissed Plaintiff's charge.  (Doc. 20-20).  Thereafter, Plaintiff initiated this lawsuit against Defendants on December 1, 2008.  (Doc. 1).

## II.  STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a)[1].  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  *See Bryant v. Commonwealth of Ky.*, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court held that:

> . . . Rule 56(c)[2] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Rule 56 requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Id.* at 324.

---

[1] Civil Rule 56 was totally revised by amendment effective December 2010.  The Committee Note makes it clear that the standard for granting summary judgment remains unchanged.  *See, e.g., Diaz v. Mitchell's Salon and Day Spa, Inc.*, No. 1:09CV882, 2011 WL 379097, at *1 (S.D. Ohio Feb. 2, 2011).  *However, the specific language of the Rule has been modified.*

[2] Now Rule 56(a).

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989), has interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions. *Stree*t points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. *Street*, 886 F.2d at 1479. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Id.*

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990). However, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . . Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (*citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 7 (5th Cir. 1992)) (alterations in original). Plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (*quoting Street*, 886 F.2d at 1480). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id. (citing Anderson*, 477 U.S. at 252).

III. <u>LAW & ANALYSIS</u>

To survive Defendants' motion for summary judgment, Rachells must come forward with enough evidence to create a genuine issue of material fact as to whether Cingular's decision to terminate him was motivated by his race.  *See Gragg v. Somerset Technical College*, 373 F.3d 763, 767 (6th Cir. 2004).  Because Plaintiff has not come forward with any direct evidence of race discrimination, we must evaluate his claim under the analysis set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).  Under this burden-shifting approach, Plaintiff must first establish a *prima facie* case of race discrimination.  *McDonnell*, 411 U.S. at 802.  If Plaintiff satisfies this requirement, the burden then shifts to Defendants "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *Id*.  Finally, should Defendants satisfy this burden of production, Plaintiff must come forward with proof showing that Defendants' stated reasons are a pretext for discrimination.  *Id*.  Because this matter is now before the Court upon Defendants' motion for summary judgment, the Court must determine whether there is "sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry."  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).  "Although the burdens of production shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (*citing Burdine*, 450 U.S. at 253).

11

A. <u>Plaintiff's Evidence</u>

Before moving into the Court's analysis, the undersigned notes that Plaintiff's opposition brief is based upon assertions made by Plaintiff, both within his brief and within his supporting affidavit, which were not substantiated by evidentiary support in the record.  Although Defendants did not directly challenge all of Plaintiff's assertions, Defendants pointed to contradictions between statements contained in Plaintiff's affidavit and those appearing in Plaintiff's deposition.  Defendants have also alleged that Plaintiff failed to conduct any discovery in this matter, and accused Plaintiff of creating an *ad hoc* record of evidence to support its opposition brief. [14]  Defendants claim that Plaintiff's affidavit was somewhat redundant, given Plaintiff's 229 page deposition which Defendants attached to their motion, and that other exhibits included by Plaintiff did not have any bearing upon the matter now under review.  Regardless of whether Plaintiff engaged in discovery efforts, the burden is now clearly on Plaintiff to provide the Court with *evidence* which sets forth specific facts showing that there is a genuine issue in dispute.  Fed. R. Civ. P. 56(c).  For the most part, Plaintiff's brief relies upon and cites to conclusory assertions which Rachells makes within his affidavit and in a letter he sent to Defendants.    But, affidavits which merely repeat vague and conclusory allegations are insufficient to state a genuine issue of material fact.  *Emmons v. McLaughlin*, 874 F.2d 351, 358 (6th Cir. 1989).  "The object [ ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990).  Instead, the Plaintiff must come forward with evidence

---

[14]  The evidence submitted by Plaintiff consists of the following: Plaintiff's affidavit and the affidavits of two former Cingular employees, a letter Plaintiff sent to two Cingular employees in 2005,  Plaintiff's tax returns for the years 2002 and 2003, Plaintiff's W-2 from 2004, a number of unreported cases, two e-mails drafted by Rachells in 2002 asserting his belief that derogatory comments were made about him, news excerpts addressing Cingular's acquisition of AT&T, and a letter Mendolia sent Plaintiff in 2005. (Doc. 28-1).  The affidavits of the two former Cingular employees are addressed in footnote 21, *infra*.

demonstrating that a jury could reasonably find in its favor.  *Cox*, 53 F.3d at 150.  Accordingly, unless supported by independent evidence, the Court will not credit the conclusory statements appearing within Plaintiff's brief and attached exhibits.

### B.  Prima Facie Case

In order to state a *prima facie* case of race discrimination against an employer under the traditional application of the *McDonnell Douglas* test, a plaintiff must show that he was: (1) a member of a protected class; (2) discharged; (3) qualified for the position; and (4) that a comparable "similarly-situated" non-protected person was treated better.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  With regard to the fourth element, Plaintiff strenuously argues that the five AT&T candidates were not similarly situated to him.  Although this factor is critical to the traditional application of the *McDonnell Douglas* analysis, it is not as important in the context of a reduction in force case.  Both parties agree that Rachells's separation from the company was the result of a true reduction in force.  In cases of an RIF, the Sixth Circuit has explained that "the plaintiff need not show that he was replaced by or treated differently from a similarly situated [] employee".  *Cichewicz v. UNOVA Indus. Auto. Sys., Inc.*, 92 F. App'x 215, 218 (6th Cir. 2004); *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *Reminder v. Roadway Express, Inc.*, 215 F. App'x 481, 483 (6th Cir. 2007).  Rather, the plaintiff must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (*citing* *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984)).  This heightened standard is necessary in a reduction in force situation because in these instances "'the most common legitimate reasons' for the discharge are the work force reductions."  *Barnes*, 896 F.2d at 1465.  Therefore, to state a *prima facie* case, at

step four, Rachells must provide the Court with evidence that he was singled out because of his race.  *Id.* at 1465-66; *Gragg*, 373 F.3d at 767-68; *accord Jones v. Mid-Cumberland Human Resource Agency*, No. 3:06-0176, 2007 WL 470448, at *4 (M.D.Tenn. Feb. 8, 2007).  Defendants do not challenge Plaintiff's ability to show evidence satisfying the first three elements of a *prima facie* case.  Rather, they argue that Plaintiff cannot meet the heightened burden at step four requiring additional evidence showing he was singled out for impermissible reasons.

In order to determine whether Plaintiff was singled out, it is necessary to define the group of individuals with which to compare whether Plaintiff was singled out.  *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 621 (6th Cir. 2006).  Plaintiff has not cited to any case law indicating that this group must be defined by the same standards applied when determining whether an individual is "similarly situated" to a plaintiff.[15]  Both parties concede that Plaintiff's Cingular peers are proper comparators.  The disagreement arises regarding the AT&T candidates.  Plaintiff argues that they should not be compared to him because they did not have the same supervisors as the Cingular candidates and because their annual performance evaluations were based upon different criteria than the Cingular candidates.  For example, Rachells highlighted that the AT&T employees' 2004 evaluations only contained questions in two focus areas: business results and personal performance results, *see* (Doc. 20-11 at 8); whereas, the 2004 performance reviews for the Cingular candidates rated them in the areas of "Drives For Results", "Drives For Strategy", and "Maximizes Talent".  (Def.'s Ex. N at 7).  Despite these differences, it is clear that 1) the RIF selection process judged all nine candidates on the same criteria (a combination of their 2004 performance review score and their RIF interview score), and 2) all

---

[15] *Bender* did not apply the strict standards set forth in *Mitchell* to determine the plaintiff's comparative group in his job elimination claim.  455 F.3d at 620-22.  *See also* n. 14 *infra*.

the candidates were vying for the same positions.  Accordingly, it would seem reasonable for the other eight candidates to form the comparative group from which to determine whether Plaintiff was singled out.  However, ultimately, regardless of which group Plaintiff is compared to, he has failed to make out a *prima facie* case of race discrimination.

Even if the Court were to limit Plaintiff's comparative group solely to his Cingular peers, the Court finds that Plaintiff has not provided sufficient evidence to satisfy the heightened burden applicable in reduction in force cases – showing that he was singled out because of his race.  Plaintiff mainly cites to his successes at the company to show that he was singled out from the rest of his peers.  The overarching theme throughout Plaintiff's brief is that he was a more successful National Retail Account Executive than his Cingular peers and that because of this status, the company would not have terminated him unless consideration of his race was at play.  But Plaintiff may not substitute his business judgment for that of Defendants to defeat summary judgment.  *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). Rachells points out that his salary for 2004 totaled $78,009.18, an amount higher than the combined total of his base salary of $56,444.00 and his at risk salary of $16,000.00, signifying that he exceeded his core goals.  Plaintiff also emphasized that he received numerous awards during his tenure at Ameritech and Cingular, was never subject to any disciplinary action, and had an outstanding reputation among his agents and their employees.  Yet, none of these claims are sufficient to demonstrate that Plaintiff was singled out.  *See LaGrant*, 748 F.2d at 1090 ("The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination.").  Rachells's subjective views of his skills and accomplishments in comparison to those of his Cingular peers do not establish that he was discriminated on the basis of race.  *Mynatt v.*

15

*Lockheed Martin Energy Sys., Inc.*, 271 F. App'x 470, 477 (6th Cir. 2008) ("A plaintiff's contention that he was better qualified than the workers who were retained is insufficient to establish a prima facie case."); *Geiger*, 579 F.3d at 625.

While a plaintiff can establish a *prima facie* case by *showing* that he or she is more qualified than the candidates that the company ultimately chose to retain, see *Schoonmaker v. Spartan Graphics Leasing, LLC.*, 595 F.3d 261, 265-67 (6th Cir. 2010), Rachells has not made such a showing.  Defendants have pointed to evidence demonstrating that Plaintiff's scores ranked him seventh among the nine candidates.  On the other hand, Plaintiff neglected to provide the Court with any evidence, other than his own assertions, that at the time of the RIF, he was more qualified than his Cingular peers.  Plaintiff suggests that because he was a "good employee" and the only African-American among his peers, the Court should presume that he was terminated for improper reasons.  But, since arguably all of the candidates were qualified for the positions, the mere fact that Plaintiff was a member of a protected class does not establish a *prima facie* case of race discrimination.  *Barnes*, 896 F.2d at 1465; *Jones,* 2007 WL 470448, at *4.  Accordingly, Plaintiff has not come forward with sufficient evidence demonstrating that he was singled out because of his race, and consequently, has not stated a *prima facie* case of race discrimination in the context of a reduction in force.[16]

---

[16] Although in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998), the Sixth Circuit indicated that a plaintiff could satisfy the fourth prong of the *McDonnell Douglas* test by demonstrating that a "comparable non-protected person was treated better", it later expounded upon this statement in *Adams v. Proto Plastics, Inc.*, 151 F. App'x 468, 469-70 (6th Cir. 2005).  In *Adams*, the Court explained that the factual scenario presented in *Ercegovich* permitted the plaintiff to establish a *prima facie* case under this standard because the plaintiff was denied an opportunity to transfer to a new position while similarly situated younger employees were given the opportunity to transfer.  151 F. App'x at 470.  Thus, *Adams* ruled that *Ercegovich* dealt with the issue of "disparate treatment between older and younger employees who were all included in the reduction in force." *Id*.  Such a minimal requirement does not apply in the case at hand because here, Rachells and his Cingular peers were all treated the same – i.e. they all had the opportunity to interview for one of the four positions being retained by the

As an aside, the Court feels compelled to note that although Plaintiff submitted additional arguments in challenging Defendants' proffered legitimate reason for terminating him, the sum total of the evidence in which Plaintiff identifies, both in relation to stating a *prima facie* case and trying to show pretext, falls short of showing race discrimination in the context of a RIF. Rachells's primary arguments consist of his belief that: 1) he was better qualified than his Cingular peers, 2) Cingular based its RIF selection process on subjective criteria, and 3) his RIF interview was different than that of all the other candidates.  However, none of this evidence amounts to showing a *prima facie* case of race discrimination under the heightened standard announced in *Barnes* with regard to RIF cases.  *See Schoonmaker*, 595 F.3d at 268.  Thus, even if we considered all of the arguments Rachells put forward as a whole, he has not shown that it is more likely than not that Defendants discriminated against him because he was African-American.

### C.  Defendants' Proffered Reason & Plaintiff's Showing of Pretext

Assuming *arguendo* that Plaintiff could state a *prima facie* case, he is unable to show that Defendants' proffered legitimate reason is pretext for race discrimination.  Once the plaintiff states a *prima facie* case, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory business reason for its decision to terminate the plaintiff.  Here, Defendants contend that Plaintiff's employment was terminated as a result of its reduction in force which was necessary after Cingular acquired AT&T Wireless.  Now that Defendants have come forward with a legitimate, non-discriminatory reason for Rachells's termination, the burden shifts to Plaintiff to show that this stated reason is pretext for intentional race discrimination. *Barnes*, 896 F.2d at 1464.  A plaintiff can demonstrate that his employer's proffered reason is

---

company.  Accordingly, there was no disparate treatment among them in this respect.  *See Schoonmaker*, 595 F.3d at 265-67; *see also Marano v. Aircraft Braking Sys., Inc.*, 138 F.Supp.2d 940, 950 (N.D.Ohio 2001) (Gwin, J.).

pretextual by showing that the stated reason: (1) has no basis in fact, (2) was not the actual reason that motivated the employer's action, or (3) was insufficient to motivate the action.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008); *Macy*, 484 F.3d at 366.

In the instant case, Rachells employs the second approach by contending that the reduction in force did not actually motivate Defendants to end his employment.  Plaintiff purports that Cingular actually sought to terminate him because of his race.  Under this ground for showing pretext, the plaintiff essentially "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal" but, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled in part on other grounds by Geiger*, 579 F.3d 614).  Plaintiff points to a number of factors as circumstantial evidence of pretext, all of which fall short of satisfying his burden at this step in the analysis.

Rachells submits that the RIF interview selection process was a sham because the interviews all entailed subjective questions which allowed Defendants to mask their discriminatory intent under the guise of a subjective evaluation.  Plaintiff, citing *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), states that employment decisions based on subjective criteria provide an opportunity for discriminatory intent to influence employment decisions.  Though this may be true, the mere fact that the RIF questions involved subjective criteria, does not demonstrate that there was an improper motive behind Cingular's decision to let Plaintiff go.  *Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 396 (6th Cir. 2006).  To the contrary, this Court has previously found that *Smith* rejected such arguments as the one now put forth by Rachells.  *Suslovic v. Black & Decker, Inc.*, No. 1:06-CV-116, 2007

WL 2153277, at *11 (N.D.Ohio July 23, 2007) (Lioi, J.) (finding that *Smith* "specifically rejected the employee's argument that basing decisions relating to a reduction in force on subjecti[ve] evaluations[,] [even when] arguably inadequate to assess [an] employee['s] [overall] work performance[,] was probative of animus."). *Smith* also noted that "an allegation of an inaccurate ratings system 'does little to help [Plaintiff] establish that [Defendant] used a subjective system in order to discriminate against [the plaintiff]". *Smith*, 195 F. App'x at 396 (*citing Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000)) (alterations in original). Accordingly, the fact that Cingular's RIF process was discretionary and based upon subjective factors does not, without more, show that the decisions were improperly based upon Plaintiff's race. *Schoonmaker*, 595 F.3d at 269 ("Even if [the defendant's] reasons were subjective, the evidence does not raise an inference of *age*-based discrimination.").

Next, in a second attempt to show that Defendants' RIF selection process was a sham, Plaintiff argues that he was not interviewed in the same manner as the other eight candidates. The SISG for all of the candidates aside from Plaintiff, centered on questions covering three critical areas: "Create Customer Loyalty", "Drive For Results", and "Use Sound Judgment". In contrast, the SISG from Rachells's interview reflected that he was only questioned on two areas: "Create Customer Loyalty" and "Use Sound Judgment", excluding the third area: "Drive For Results". Plaintiff notes that the second and third pages of his SISG both contain identical questions on the topic of "Creates Customer Loyalty".[17] Plaintiff argues that the inconsistency between the questions given to him and those presented to the other eight candidates demonstrates "disparate treatment "at it's [sic] finest", (Pl.'s Br. at 16), and undermines the legitimacy of the interview process.

---

[17] Both parties agree that page three of Rachells's SISG is not a duplicate copy of page two because the responses on page three do not mirror the responses on page two.

Cingular argues that although it would appear from the face of Plaintiff's SISG that he was not questioned regarding his abilities in the area of "Drive For Results", this contention is untrue.  Instead, Defendants maintain that Hart did question Plaintiff on this area, but that Hart simply transcribed Plaintiff's answers on the wrong form.  Defendants argue that Plaintiff's answers found on the second, duplicate page headed "Create Customer Loyalty" actually correspond to the questions appearing under the "Drive For Results" section found in all of the other candidates' SISG evaluation forms.  To illustrate, Cingular notes that the first question in the "Create Customer Loyalty" section asked the candidate: "*Tell me about the most you've ever done to try and satisfy a particular customer*" (Def.'s Ex. N at 4); whereas the "Drive For Results" section asked: "*Describe a time when you were particularly busy at work.  What kind of hours did you put in? How did the situation affect you?*"  (Def.'s Ex. H at 8).  Defendants highlight that Hart's notes documenting Rachells's answer to the first question on the second, duplicate page headed "Create Customer Loyalty", stated: "*When National Retail launched 5 years ago, Tony was only Account Manager. Took many phone calls and worked hard. National Retail Channel launched.*" (Def.'s Ex. N at 4).  Cingular contends that this response as well as Plaintiff's other answers appearing on the second, duplicate page headed "Create Customer Loyalty" of his SISG demonstrate that he was responding to the questions appearing under the "Drive For Results" section, as his answer would not have been responsive to the first question under the "Create Customer Loyalty" section.  (Doc. 29 ("Def.'s Reply") at 6).  Thus, Defendants submit that Plaintiff was interviewed in the same manner as all of the other candidates.[18]

_____

[18] Defendants further maintain that even if Plaintiff had scored a "5" in this area, the highest score available, his overall combined score would not have been high enough to rank him among the four best candidates.  (Def.'s Reply at 7-8).  For example, had Rachells received a score of "5" in the area of "Drive For Results", his overall score for the interview would have totaled 10

Though Defendants' argument appears to present a plausible explanation of why Plaintiff's SISG differs from those of the remaining candidates, when considering a motion for summary judgment, the Court must view all facts in a light most favorable to the non-moving party, which in this case is Rachells.  From such a standpoint, assuming that Plaintiff was administered questions different from those administered to the other applicants might suggest that Plaintiff was treated differently.  However, it is not probative of whether this disparate treatment was motivated by race considerations.  *See Geiger*, 579 F.3d at 625 (stating that although the employer's actions were "undeniably suspicious", they were ultimately irrelevant because the plaintiff could not prove that the employer's actions were linked to the plaintiff's age).  Plaintiff has failed to come forward with any evidence, direct or circumstantial, suggesting that it is more likely than not that the differences in the SISGs were related to Plaintiff's race.  To survive summary judgment, Plaintiff must come forward with such evidence.  *See Sybrandt v. Home Depot, U.S.A., Inc*., 560 F.3d 553, 561-62 (6th Cir. 2009) (ruling that the plaintiff "failed to highlight any material evidence suggesting that Home Depot's stated reason for discharging her was a pretext to mask *sex* discrimination" and that the lack of evidence supporting a charge of *sex*-based discrimination supported granting the motion for summary judgment) (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097 (2000)) (emphasis added).

Next, Plaintiff attempts to show pretext by highlighting that Cingular chose to retain Joseph Espiritu for the fourth National Retail Account Executive position.  Plaintiff purports that

---

points  (2 points for "Create Customer Loyalty"; 5 points for "Drive For Results"; and 3 points for "Use Sound Judgment").  When this score is added to his overall 2004 performance evaluation score of 2.6, Plaintiff's combined total score would have equaled 12.6, and would have ranked him fifth among the nine candidates.  Consequently, Defendants submit that summary judgment should be granted because even considering these facts in a light most favorable to Plaintiff, he cannot show that he was most qualified for the position.

Defendants made a "big deal" about the fact that all three of Plaintiff's Cingular peers presented presentations during their RIF interviews.  Yet, Rachells notes that Cingular retained Joseph Espiritu even though he did not prepare a presentation for his RIF interview with Hart.  While Defendants acknowledge that Espiritu did not make a presentation, Plaintiff has not articulated how Defendants' retention of Espiritu demonstrated racial animus toward Plaintiff.  It is worth noting that Espiritu is a Hispanic male and that he was rated higher than Plaintiff in both his RIF interview and 2004 annual review.  Accordingly, despite his failure to offer a presentation, his combined RIF score ranked him higher than Rachells, and Rachells has not pointed to any evidence demonstrating that he was more qualified than Espiritu.

Plaintiff also offers a number of theories on how his 2003 and 2004 annual performance reviews show that Cingular terminated him because of his race.  First, Plaintiff refers back to his 2003 performance review score in an effort to show that he was better qualified than his Cingular peers retained by Defendants.  Plaintiff again highlights that his overall 2003 review rating was higher than all of his Cingular peers, and that his average completion rate for turning in his Renewing Account Executive ("RAE") checklist was the second highest among the four Cingular candidates for the year 2003.[19]  Rachells received an overall review rating of 3.4 in 2003, while Christopher received the next highest score of 3.1.  Plaintiff points to this evidence partly to discredit Defendants' allegation that Plaintiff had "less-than-stellar behavior leading up to the selection process".  (Def.'s Stmt of Facts at ¶ 30).  In making this statement, Defendants

---

[19] Plaintiff also points out that a portion of his 2003 performance evaluation was missing from the records submitted by Defendant while the corresponding evaluations submitted by Defendants for the other Cingular candidates included a complete copy of each individual's 2003 performance review.  Plaintiff emphasized that he was not accusing Defendants' counsel of improperly redacting information.  The burden of production and persuasion at this stage of the analysis is on Plaintiff.  Defendants did not challenge Plaintiff's assertion that he received the highest performance review score in 2003.  Therefore, this omission is not material as the parties do not dispute this fact.

highlighted that during Rachells's deposition, he admitted that it was "possible" that there were times when he may have failed to turn in his RAE checklists.  (*Id.*).

Plaintiff's argument suffers from one key flaw: he is attempting to use his 2003 performance evaluation and 2003 RAE checklist completion rate to challenge Defendants' allegations regarding his performance in 2004.  The two simply do not equate.  Cingular does not argue that Rachells's performance was poor in 2003; instead, it suggests that Plaintiff's performance began to decline in 2004.  Defendants have pointed to Plaintiff's own statements to support this argument.  Although Plaintiff may have exhibited stellar skills and talent in 2003, his performance during that year is not necessarily indicative of his performance in 2004.  Therefore, his references to his performance in 2003 do not undercut Defendants' statements regarding his performance in 2004.  Additionally, although Plaintiff asserts that Cingular informed him that the RIF selection process would be based on each candidates' 2003 performance review scores, Rachells again failed to produce evidence substantiating this claim.  Moreover, even giving him the benefit of the doubt, had Hart utilized the Cingular candidates' 2003 performance review scores, Rachells still would have ranked last among his peers,[20] and, because Plaintiff did not provide the Court with the 2003 performance review scores for the AT&T candidates, neither has he shown that he would have outranked them based on their performances in 2003.

---

[20] John Stokes received an overall rating of 3 in his 2003 performance evaluation.  Adding this number to Stokes's RIF interview score of 14 brings his combined RIF score to 17.  Joe Christopher received an overall rating of 3.1 in his 2003 performance review.  Adding this number to Christopher's RIF interview score of 14 equals a combined score of 17.  Cheryl Patteson received a 2.5 overall evaluation score for her performance in 2003; this score combined with her RIF interview score of 11 totals 13.5.  Finally, Rachells received a 3.4 overall performance score in 2003.  If we combine this score with his RIF interview score of 10 (allowing for a score of 5 in the area of "Drive For Results"), his scores only total 13.4, the lowest of the Cingular candidates.

While the Court agrees that there are instances when a plaintiff's superior qualifications in relation to his peers can show pretext, the case *sub judice* does not fall within this category of cases. In *Risch v. Royal Oak Police Department*, the Sixth Circuit stated:

> We have explained that "whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination." When the plaintiff offers "other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment."

581 F.3d 383, 392 (6th Cir. 2009) (internal citations omitted). Under this standard, Plaintiff must do more than allege that he was better qualified than the candidates chosen to remain with Cingular. He must also come forward with some "other probative evidence of discrimination". *Id*. Unfortunately, Rachells failed to present any evidence tending to show that Cingular discriminated against him because he was African-American. For instance, in *Risch*, the plaintiff averred that her employer declined to promote her on the basis of her gender, but her employer argued that it promoted a better qualified applicant. *Id.* at 390-91. The Sixth Circuit held that *Risch* successfully challenged whether her employer's reasons were pretextual by showing evidence that 1) she was arguably more qualified for the position than the male actually selected, 2) the males in the department often openly expressed views that females would never be promoted; and 3) the employer maintained a discriminatory working atmosphere. *Id.* at 392-93.

In contrast, Rachells has not presented any probative evidence showing racial discrimination of this ilk. Defendants acknowledged that Fine made unsavory racial and ethnic remarks regarding African-Americans and Arabs. For example, Plaintiff testified that while dining with Fine at an up-scale restaurant after a training event, an African-American gentleman entered the restaurant with a Caucasian woman. (Rachells Depo. at 53-54). Upon seeing this, Plaintiff testified that Fine stated, "what's with them. . . [he] must be a football player[] or

24

something."  (*Id*. at 54).  Plaintiff also testified that he heard Fine make inappropriate comments regarding some of Cingular's Arab dealers, referencing terrorism and joking about the Arabs refusing to eat chicken cordon bleu because it had ham on it.  (*Id*. at 200-01).   Despite testifying to these events, in his brief, Rachells expressly indicated that these incidents were not principal to his lawsuit.  Notwithstanding, the Court finds that even if true, these remarks do not infer that Rachells's termination was linked to his race as these comments were not made in the context of speaking about the RIF, and neither is it alleged that they were made in or around the time of the RIF.  *Rowan,* 360 F.3d at 550-51 (finding that stray comments made years before the employer's adverse employment action cannot serve as direct evidence of bias to show pretext); *Lockett v. Marsh USA, Inc.,* 354 F. App'x 984, 994 (6th Cir. 2009) ("[S]tatements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden… of demonstrating animus.") (alteration in original).  Likewise, although Plaintiff contends that he contacted the Human Resources department to discuss alleged racial issues in the company involving himself and two minority store managers, in his brief he did not specifically argue that Cingular maintained a racially discriminatory atmosphere, present arguments to this effect, or come forward with admissible evidence tending to support such a theory.[21]

Plaintiff also attempts to show that the RIF was not the true reason for his termination by contesting the legitimacy of his 2004 performance evaluation. Both parties agree that Plaintiff

---

[21]A district court cannot consider hearsay evidence on a motion for summary judgment. *Mitchell,* 964 F.2d at 584-85.  The affidavits Plaintiff submitted from Michael Johnson, (Doc. 28-3), and Maribel Jones, (Doc. 28-4), regarding their subjective beliefs about why Fine made certain employment decisions constitute inadmissible hearsay.  Statements based upon "rumors, conclusory allegations and subjective beliefs [ ] are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Id.* at 585; *Jones v. Butler Metro. Hous. Auth.,* 40 F. App'x 131, 134-35 (6th Cir. 2002).  In addition, the Court notes that Plaintiff's use of Maribel Jones's affidavit creates an inconsistency in his argument.  Maribel Jones, is a Hispanic woman, (Doc. 28-4 at ¶ 7), and alleged that she suffered from racial discrimination at the hand of Fine and others at Cingular (*Id.* at ¶¶ 32-52).  However, the Court notes that Fine approved the retention of Espiritu, a Hispanic, for the final National Retail Account Executive position.

was the highest rated National Retail Account Executive with Cingular in 2003.  However, Hart assigned him an overall rating of 2.6 for his performance in 2004, placing Rachells last when compared with his Cingular peers.  Plaintiff maintains that it is highly unlikely that an employee would go from being the highest rated performer in 2003 to being the lowest rated in 2004, and that this extreme change in his performance rating demonstrates that Cingular manipulated his 2004 performance review score in order to terminate him under the pretext of the RIF.  For example, Rachells professes that he had never seen the results of his 2004 performance evaluation prior to this litigation because Cingular had never presented it to him for review or signature.  He also asserts that despite what the 2004 performance evaluation may reflect, he had the highest attainment percentage among his Cingular peers in 2004.  However, Plaintiff failed to meet his burden at the summary judgment stage by supplying the Court with evidence as to the attainment rate of his peers during this time period to prove that his performance was superior to that of his peers.  _Schoonmaker_, 595 F.3d at 268-69 (finding that the plaintiff failed to provide any evidence to support her subjective belief that she was more qualified than her peers, and that her subjective views were insufficient to establish discrimination, or an inference that her employer's stated reason for its employment decision was pretextual); _see also Geiger_, 579 F.3d at 625 ("[T]he employer's motivation, not the applicant's perceptions, or even an objective assessment [] of what qualifications are required for a particular position is key to the discrimination inquiry") (_quoting Browning v. Dep't of the Army_, 436 F.3d 692, 696-97 (6th Cir. 2006)) (alterations in original).

Finally, Rachells attacks Hart's stated reasons for the score assigned to Rachells's performance in 2004.  Hart indicated that Plaintiff's 2004 annual review score was reflective of the fact that Plaintiff had participated in fantasy football during meetings, occasionally showed

up late for staff meetings and fell asleep during a presentation.  (Def.'s Ex. N at 8-9).  Rachells denies these accusations, claiming that he actively participated in staff meetings, only worked on fantasy football material during breaks, and never fell asleep during a presentation.  But, even accepting these facts as true, Plaintiff has not pointed to anything to implicate that Hart skewed Rachells's performance review score on the basis of race.  To demonstrate pretext, Plaintiff must show that Defendants' actions were linked to his race, not just that they were bad or arguably unfair business decisions.  *Schoonmaker*, 595 F.3d at 270-71 ("the law does not require the employer to make perfect decisions, but simply prevents employers from taking adverse employment actions for impermissible, discriminatory reasons").

Similarly, the Court rejects Plaintiff's implication that Cingular's proffered reason is pretextual because it made statements that Plaintiff views as conflicting.  While the Sixth Circuit has held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext", *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002), this is not a case wherein Defendants have given varying reasons for Plaintiff's dismissal. Here, Defendants have consistently maintained that Rachells was terminated due to the RIF. Plaintiff notes, in a letter from Cingular dated in 2005, it notified Plaintiff that its decision to terminate him was not related to poor performance, (Doc. 28-15 at 3); as compared to statements made in 2010 by Cingular's Employee Relations Manger, Karen Mendolia, when she attested that Plaintiff exhibited "less-than-stellar behavior leading up to the selection process". (Mendolia Aff. at ¶ 25).  Though Plaintiff intimates that these two statements contradict, when viewed in context, the two do not conflict.  The initial statement is in reference to the RIF.  It is true that the need to terminate Plaintiff did not arise from his poor or sub-par performance. Rather, it was a result of the RIF.  His performance in 2004 only became relevant when it

became necessary for Defendants to reduce its workforce due to its recent acquisition. Accordingly, the second statement references Plaintiff's performance only with regard to how the selection was made to determine which employees would remain with the company.  The very nature of a reduction in force creates the necessity for employers to release even good employees.  *LaGrant*, 748 F.2d at 1090; *Barnes*, 896 F.2d at 1466.  Moreover, despite whatever inconsistencies Plaintiff perceived between these statements, Cingular has never varied from its contention that Plaintiff was terminated solely as a result of the reduction in force.

## IV.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that Defendants' *Motion for Summary Judgment* (Doc. 19), be **GRANTED**.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: February 15, 2012.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).