RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY RACHELLS,

       *Plaintiff-Appellant,*

    *v.*

CINGULAR WIRELESS EMPLOYEE SERVICES, LLC and NEW CINGULAR WIRELESS SERVICES, INC.,

       *Defendants-Appellees.*

No. 12-4137

1:08cv2815

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:08-cv-02815—Lesley Brooks Wells, District Judge.

Argued: July 25, 2013

Decided and Filed: October 17, 2013

Before: COLE and DONALD, Circuit Judges; MARBLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** E. Yvonne Harris, Cleveland, Ohio, for Appellant. Casey Alan Coyle, RHOADS & SINON LLP, Harrisburg, Pennsylvania, for Appellees **ON BRIEF:** E. Yvonne Harris, Cleveland, Ohio, for Appellant. Todd J. Shill, John R. Martin, RHOADS & SINON LLP, Harrisburg, Pennsylvania, for Appellees.

---

## OPINION

---

    ALGENON L. MARBLEY, District Judge. As an Indirect Channel National Retail Account Executive in Cingular Wireless's Cleveland region, Anthony Rachells received numerous sales awards, consistently exceeded company sales goals by the

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

greatest margin of any of his co-workers, and, in 2003, earned the top performance review among his Cingular peers.  In 2004, Cingular acquired AT&T and conducted a reduction in force, in which it selected just four of nine existing Cingular and AT&T employees in Rachells' position to remain with the company.  Although Rachells exceeded his 2004 sales goals by a greater margin than in 2003, Rachells received the lowest 2004 performance review score of any candidate and was ranked seventh out of nine in the overall selection process.  In February 2005, Rachells was notified that he would be terminated effective April 15, 2005.  Rachells, who is African-American, sued for racial discrimination arising out of his discharge.  The district court granted summary judgment to Cingular on all claims, and Rachells now appeals.  For the following reasons, we **REVERSE**, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Rachells' Employment History and Job Performance

Rachells, an African-American male, began working for Ameritech Corporation as a sales representative in the company's Cleveland region in 1996.  In approximately 1998, Plaintiff was promoted to be an account manager for Ameritech's Indirect Channel division.  Ameritech was subsequently acquired by SBC Communications, Inc. ("SBC").  In 2000, the domestic wireless divisions of SBC and Bellsouth Corporation entered into a joint venture to form Cingular, a provider of wireless and digital telecommunications products and services.

Rachells remained employed with the company throughout these changes and began working as an Indirect Channel National Retail Account Executive in Cingular's Cleveland region sometime thereafter.[1]  In this position, Rachells was managed by Dale Zerner until July 2002, by Lisa Zhang until 2003, and finally by Keith Hart from 2003

---

[1]Plaintiff avers that he began working as a National Retail Account Executive in the Spring of 2001.  Cingular contends that Plaintiff began working as an Indirect Account Executive with Cingular's Indirect Sales Channel in or around December 2001.  Plaintiff labels the position as a "National Retail Account Executive" while Defendant describes the position as that of an "Indirect Account Executive." For the sake of clarity, we use the term "National Retail Account Executive."

until Rachells' termination in 2005. David Fine, a Caucasian male, became the Director of the Indirect Channel for the Cleveland region in May 2001.[2]

Rachells' salary consisted of a "base salary" and an "at risk salary" or sales commission. His total "at risk" compensation was determined by his performance relative to company sales attainment percentage goals. Thus, Rachells could receive 100% of his "at risk" salary if he achieved 100% of his attainment percentage goal, 200% of his "at risk" salary if he achieved 200% of his goal, etc. Rachells' 2002 and 2003 tax returns, and his 2004 W-2 form indicate that he produced a high volume of sales relative to his attainment percentage goals. Specifically, Rachells achieved approximately 259% of his attainment percentage in 2002,[3] approximately 124% of his percentage in 2003,[4] and approximately 235% of his percentage in 2004.[5] Cingular does not dispute that these attainment percentages exceeded those of Rachells' Cingular peers, Cheryl Patteson (Caucasian female), John Stokes (Caucasian male), and Joseph Christopher (Caucasian male) (collectively the "Cingular peers" or "Cingular candidates").[6]

During his tenure at Cingular, Rachells received at least nine awards and/or accolades. These included the Cingular Summit Winner award in 2001 and 2002 – "an accolade bestowed yearly to individuals from Cingular who had the highest attainment percentage of sales in the entire country" – and the "Crown of Excellence" in 2003, awarded to individuals for "achievement in sales and excellence." In addition, Rachells received the highest 2003 performance evaluation score of his peers at Cingular at that time.

_____

[2] The parties disagree as to when Keith Hart began to manage Rachells.

[3] In 2002, Rachells' base salary was $30,000 and his "at risk" compensation was $24,000.00. Rachells' total pay from Cingular in 2002 was $92,209.00.

[4] In 2003, Rachells' base salary was $30,000 and his "at risk" compensation was $24,000.00. Rachells' total pay from Cingular in 2003 was $59,690.00.

[5] In 2004, Rachells' base salary was $40,444 and his "at risk" compensation was $16,000.00. Rachells' total pay from Cingular in 2004 was $78,009.18.

[6] Joseph Christopher became a National Retail Account Executive in approximately August 2004.

### B. Acquisition of AT&T and Reduction in Force (RIF)

Around October 2004, Cingular acquired AT&T Wireless Services, Inc. ("AT&T"). Subsequently, in approximately December 2004, Cingular's senior leadership directed its management teams to realign their workforce in light of the recent acquisition. Each leader was directed to "(1) evaluate[] current business trends and results in their respective areas of responsibility; (2) evaluate[] staffing levels within the combined Cingular and AT&T Wireless workforce; and (3) determine[] the appropriate staffing levels based on projected business goals." This realignment process led to the elimination of numerous jobs within Cingular, affecting workers across the country (the "reduction in force" or "RIF").

In this case, the Vice President and General Manager of Cingular's Ohio and Western Pennsylvania market directed David Fine to review the productivity of the Cingular and AT&T Indirect Channel Account teams. In addition to the four National Retail Account Executives already employed with Cingular, AT&T had five individuals working in the same capacity: Joel Espiritu (Hispanic male), Ryan Keane (Caucasian male), Edwin Morales (Hispanic male), Marie Lavender (Caucasian female), and Francine Alexander (Caucasian female) (collectively the "AT&T candidates"). Fine was directed to use guidelines set forth in Cingular's Indirect Span of Control Recommendation, to examine the productivity levels within the Northern Ohio sub-market. After conducting his analysis, Fine determined that it was only necessary to retain four of the nine National Retail Account Executives currently employed between the two companies.

To identify the most qualified employees for retention by Cingular, Keith Hart was charged with evaluating all nine candidates and ranking them in order (the "RIF selection process"). He purportedly utilized the Staffing Integration Guidelines for Human Resources and Managers as a guide to evaluate and rate each candidate. Hart's formal evaluation of each candidate included two components. The first component was the employee's 2004 performance evaluation score. For the Cingular candidates, whom

Hart managed, Hart included the 2004 performance reviews that he had completed.[7]  The AT&T candidates were supervised by AT&T manager David Gannon, who also completed their 2004 performance reviews.  Therefore, to evaluate the AT&T candidates, Hart was to have reviewed Gannon's 2004 performance evaluations and consulted with Gannon to discuss the AT&T candidates' abilities and contributions vis-à-vis their future performance.

The second component used to rate each candidate was derived from scores Hart assigned to questions answered by the candidates during one-on-one interviews with Hart in mid-January 2005 (the "RIF interview score").  The interview questions were selected from a Staffing Integration Selection Guide ("SISG") given to Hart, which Defendants allege were similar to the guidelines dispersed throughout the company nationally.  Hart rated each employee in the following categories: 1) Create Customer Loyalty; 2) Drive For Results; and 3) Use Sound Judgment.  For each category, the employee was assigned a score between "5" representing that the candidate "consistently exceed[ed] performance objectives/behavioral expectations," and "1" indicating that the candidate "d[id] not meet basic performance objectives/behavioral expectations."  After rating each candidate under this two-part rubric,[8] Hart submitted his findings to Fine for approval.

In his 2004 annual review, Hart assigned Rachells an overall score of 2.6 for his performance during the year.  This was the lowest 2004 performance score received by any of the nine candidates.  Hart indicated that Rachells, *inter alia*, showed up late for meetings, worked on fantasy football during a "boot camp" training session in August 2004, and failed to contribute in staff meetings.  Rachells denies these allegations, and

---

[7]The record does not reflect when Hart completed the Cingular candidates' 2004 annual reviews.

[8]In addition to considering the candidate's 2004 performance review score and RIF interview score, Cingular contends that Hart also looked at the employee's "(1) previous performance evaluations; (2) Code of Conduct/disciplinary record; and (3) client and/or peer feedback."

avers that his 2004 performance evaluation was "bogus," subjective, and racially motivated.[9]

With regard to Rachells' RIF interview, Rachells contends that he was the first of the Cingular candidates to be interviewed, and was never informed of what the interview process would entail. Cingular asserts that Rachells was aware that the interview would be used to determine whether he would remain with Cingular. Cingular also highlights that, of the Cingular candidates, Rachells was the only person who did not prepare a presentation for the RIF interview. None of the AT&T candidates, however, prepared presentations.

Hart assigned Rachells a score of 2 out of 5 in the areas of "Create Customer Loyalty" and "Drive For Results," and 3 out of 5 in the area of "Use Sound Judgment." Rachells contends that these scores reflect Hart's racial bias. In particular, he points out that Cingular's copy of the SISG from Rachells' interview does not, on its face, reflect that Rachells was interviewed in the area of "Drive For Results."[10] Rachells avers that this reflects the fact that Hart interviewed him twice in the area of "Create Customer Loyalty."[11] Rachells agrees that Hart asked him questions consistent with those appearing in his SISG, with respect to the two areas in which he was interviewed. All eight remaining candidates were interviewed in all three areas, as reflected in their SISGs.

Rachells' combined score in the RIF selection process ranked him seventh among the nine candidates. Rachells' Cingular peers, all Caucasian, received the highest three scores and were selected to remain with Cingular. An AT&T candidate, Joseph Espiritu, a Hispanic male, ranked fourth among the nine candidates and was selected as the fourth

---

[9] Rachells avers that he cannot recall a time when he showed up late to a meeting, and that he did actively participate in staff meetings. He also denies working on any fantasy football during meetings, but instead, alleges that he and Christopher merely read the fantasy football book during breaks. Furthermore, he avers that, although Hart questioned him regarding this activity, Hart did not question Christopher. Cingular points out that Rachells' deposition testimony indicated he was not sure whether Hart addressed this matter with Christopher.

[10] Although Plaintiff indicated that this error appeared in his 2004 performance evaluation, it is clear from the record that he was actually referring to the SISG.

[11] Cingular contests these allegations.

and final National Retail Account Executive to remain with Cingular. Cingular maintains that its ultimate goal was to select the four most qualified candidates, "i.e. those who possessed the strongest skills, abilities, and experience," to remain with the company. The five employees not selected included two Caucasian females, one Caucasian male, one Hispanic male and Rachells. In February 2005, Cingular notified Rachells of his termination to be effective April 15, 2005.

## C. Allegations of Racial Discrimination

Rachells avers that, under David Fine's tenure as head of Cingular's Cleveland region, there was a general atmosphere of hostility toward African-Americans and Hispanics. Rachells recalled that, at his 2003 performance evaluation, which was conducted by Hart, Hart mentioned that Fine "had it in" for Rachells, but that Hart did not know why. He describes being approached by two minority Direct Channel retail store managers in the Cleveland region, Maribel Jones (Hispanic female) and Michael Johnson (African-American male), who were concerned about the way Cingular management was reviewing their performance in 2003. Rachells avers that he sent two emails to Cingular human resources officer Vicki Barr, on May 14, 2003 and July 2, 2003, detailing his, Jones' and Johnson's concerns. He further avers that he received a response from Barr on July 3, 2003, stating that she could only meet with Rachells, Jones and Johnson on an individual basis. Cingular denies any knowledge of these emails. Rachells observed that Jones, Johnson, and other minority retail managers quit following their poor 2003 performance reviews, such that – by 2004 – only one minority Direct Channel store manager remained among approximately 15 stores.

Jones and Johnson also attest that the general atmosphere in Cingular's Cleveland region was hostile towards minority employees. As Direct Channel store managers, Jones and Johnson were indirectly supervised by David Fine. Jones and Johnson give several specific examples of what they considered to be discriminatory conduct by Fine and other Cingular supervisors. The first is Fine's 2003 decision to promote Troy Bagshaw, a Caucasian male, to District Manager, over minority applicants Jones and Johnson. Jones and Johnson aver that they applied for the District Manager

position and were informed that the promotion would be "based on ability to drive sales in retail stores." Jones and Johnson attest that, although they each had tremendous success in driving sales at their respective stores, Bagshaw had "extremely poor sales performance as a store manager" and "only met quota one (1) time [since] the year 2000." Bagshaw was Jones' "direct supervisor" at the time both applied for the District Manager position, and Jones avers that she has personal knowledge of Bagshaw's sales performance because – on the one occasion on which Bagshaw satisfied his quota – she "personally sold [the] approximately 60 or more phones" that enabled him to do so. Fine nevertheless selected Bagshaw for the District Manager position. Afterwards, Johnson recalls that he "discussed with Dave Fine the reason behind Bagshaw's promotion and Dave Fine was very vague, insulted that [Johnson] questioned him, and told [Johnson] only that it was based on 'operation issues.'"

Jones and Johnson also attest that, after his promotion to District Manager in 2003, Bagshaw conducted the 2003 performance reviews of his supervisees, including Jones and Johnson. Jones and Johnson stated that – in contrast to Bagshaw's Caucasian supervisees – Bagshaw gave both individuals exceptionally poor evaluations that did not reflect their respective 2003 sales achievements, and deviated dramatically from positive evaluations given by other supervisors in past years. Both Johnson and Jones aver that they "challenged th[eir] [2003] evaluation[s] with Dave Fine," but that "he did nothing about it." Jones also recalls that, based on her personal observations of Bagshaw, he only associated with "Whites," not those of other races, and only promoted Caucasian employees. As other evidence of preferential treatment given to Caucasian employees, Jones testifies that she has personal knowledge that a Caucasian female retail manager at the Lyndhurst store "was losing money, had theft issues, had a loss of $18,000 in inventory, petty cash was missing and yet she was not fired, but was transferred to a smaller store location."

Both Jones and Johnson attest that they discussed the perceived discrimination in the Cleveland region with Rachells, and that they saw copies of both emails sent by Rachells to Vicki Barr on May 5, 2003 and July 2, 2003. Jones and Johnson further

attest that no one from Cingular ever contacted either of them to follow up on the complaints. Although neither Johnson nor Jones professes to have personal knowledge of whether Fine himself was informed of Rachells' emails, Jones states that Bagshaw subsequently "presented to [her] a two page list of corrections and/or jobs that needed to be done," including "scrubbing the cracks in the bathroom tile; replacing the fixtures [lights] in the store; painting the back wall and ceiling tiles, etc.," which she took to be retaliation for the complaints emails to Barr.

Finally, Jones and Johnson attest that, based on what they perceived to be racial animus in their 2003 performance evaluations, they ultimately quit their positions with Cingular. Jones left Cingular in December 2003. Johnson left Cingular in July 2004.

## D. Procedural History

Rachells filed this action against Cingular in December 2008, alleging claims under federal and Ohio law for race discrimination arising out of his termination. Rachells failed to make timely discovery requests, and on March 1, 2009, Cingular moved for summary judgment on all claims. In support of its motion, Cingular submitted a "Statement of Undisputed Facts," as well as exhibits including internal staffing and severance policy documents, excerpts from Rachells' deposition, copies of workforce realignment documentation, and an affidavit from Cingular Human Resources Manager Karen Mendolia.

Rachells subsequently moved to compel discovery and/or extend the discovery cut-off deadline, and the district court denied the motion without comment. Rachells then filed his response in opposition to Cingular's Motion for Summary Judgment, accompanied by Rachells' tax documents, select correspondence between Rachells and Cingular, and affidavits from Rachells, Jones and Johnson.

The district court referred Cingular's summary judgment motion to a magistrate judge for findings of fact and conclusions of law. The resulting report and recommendation (the "R&R"), after striking the Jones and Johnson affidavits as inadmissible hearsay, concluded that Rachells' evidence was insufficient to establish a

*prima facie* case of race discrimination, and recommended summary judgment for Cingular. The district court overruled Rachells' timely objections and adopted the R&R in its entirety. Rachells now timely appeals both (1) the district court's denial of Rachells' motion to extend discovery; and (2) the district court's decision to grant summary judgment to Cingular. Because, as described below, we hold that the district court erred in granting summary judgment for Cingular based on the evidence presented, we need not decide whether the district court abused its discretion in denying Rachells' motion to extend discovery.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 759 (6th Cir. 2010). Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n.5 (6th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). The non-movant then must set forth specific facts showing that there is a genuine issue for trial. *Id.* (quoting Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 615 n.5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences are viewed in the light most favorable to the party opposing the

motion. *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.  ANALYSIS

Rachells does not present direct evidence of racial discrimination.  In the absence of such direct evidence, "the burden-shifting approach for inferential proof of discrimination set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 658 (6th Cir. 1999) (citing *Burns v. City of Columbus Dep't of Pub. Safety*, 91 F.3d 836, 843 (6th Cir. 1996)).  The same analysis applies to Rachells' claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., and Ohio Rev. Code § 4112.99.  *Id.* (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (1991)).  Because Rachells alleges racial discrimination under each provision for acts arising out of the same facts and circumstances – namely, Rachells' termination by Cingular in the RIF – we consider these claims together.

Under the *McDonnell Douglas* framework, Rachells must first make out a *prima facie* case of racial discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If he meets this requirement, Cingular must articulate some legitimate, nondiscriminatory reason for its employment decision.  *Id.*  Finally, if Cingular offers such an explanation, Rachells "must point out 'evidence from which a jury could reasonably reject [Cingular's] explanation'" as pretextual. *Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  At the summary judgment stage, the district court must determine whether there is "sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry."  *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

### A. Prima Facie Case

Rachells has alleged that, in terminating him in the reduction in force, Cingular unlawfully discriminated on the basis of race. As this Court has explained, "[t]here are many 'context-dependent ways by which plaintiffs may establish a prima facie case'" of discrimination. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704 (6th Cir. 2007) (quoting *Macy*, 484 F.3d at 365 (emphasis removed)). The pivotal question is always "whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Macy*, 484 F.3d at 365).

Generally, to establish a *prima facie* case of discrimination, a plaintiff must show that he or she was: (1) a member of a protected class; (2) discharged; (3) qualified for the position; and (4) that a "similarly situated" non-protected person was treated better. *Mitchell*, 964 F.2d at 582. Where, as here, a discrimination claim is based on termination arising out of a work force reduction, "this court has modified the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009) (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Cingular does not dispute that Rachells satisfies the first three prima facie elements, but argues that Rachells failed to present additional evidence to show that Rachells was "singled out" for impermissible reasons.

### 1. Comparable Employees

As a preliminary matter, to evaluate whether Rachells was singled out on the basis of race, we must first identify the group of employees with whom Rachells should be compared. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 621 (6th Cir. 2006), *cert. denied*, 550 U.S. 904 (2007). Rachells argues that he may only be properly compared to other Cingular candidates, because the AT&T candidates did not have the same supervisors, and their annual performance evaluations were based upon different

criteria.  The R&R, however, found that, "[d]espite these differences, it is clear that 1) the RIF selection process judged all nine candidates on the same criteria (a combination of their 2004 performance review score and their RIF interview score), and 2) all the candidates were vying for the same positions." *R&R* at 14-15.  It therefore concluded that it was "reasonable for the other eight candidates to form the comparative group from which to determine whether [Rachells] was singled out." *Id.* at 15.

In defining the relevant comparison group in RIF, this Court has previously determined that, "we must insure that any observed disparity in the treatment received by the Plaintiff[] versus other employees is not the result of legitimate differences in how the company selected other positions for elimination or how a particular decisionmaker who had no voice in the Plaintiff['s] position[] made certain recommendations on other positions." *Bender*, 455 F.3d at 621.  We therefore concluded that, "[l]ogically, . . . the relevant group must include: (1) the Plaintiff['s] position[]; (2) all of the positions slated for elimination that were reviewed by the same decisionmaker(s); and (3) all equivalent, but only the equivalent, positions [to] those held by the Plaintiff[s]."  *Id.*

Taking a similar approach here, employees comparable to Rachells must have equivalent positions, be subject to the same decision-making processes, and subject to evaluation by the same decisionmakers.  Although the AT&T candidates were subject to the same RIF interview as the Cingular candidates, they were not subject to the same 2004 performance review criteria.  For example, the AT&T employees' 2004 evaluations only contained questions in two focus areas:  business results and personal performance results.  Cingular's 2004 performance reviews, in contrast, rated candidates in the areas of "Drives For Results," "Drives For Strategy," and "Maximizes Talent."  Perhaps more importantly, the AT&T and Cingular candidates were not subject to evaluation by the same decisionmakers.  Although Hart conducted the RIF interviews for all candidates, he conducted the 2004 performance reviews only for the Cingular candidates.  The 2004 performance evaluations for the AT&T candidates were completed solely by David Gannon.  In addition, Gannon purportedly gave Hart an oral assessment of the AT&T candidates' competencies and performance during the RIF selection process.  As this

Case: 12-4137 Document: 40-2 Filed: 06/17/13 Page: 14 of 24 PageID #: 494

Court has previously explained, in determining the relevant comparison group for the purposes of evaluating whether an employee was "singled out," "we must insure that any observed disparity in the treatment received by the Plaintiff[] versus other employees is not the result of . . . how a particular decisionmaker who had no voice in the Plaintiff['s] position[] made certain recommendations on other positions." *Bender*, 455 F.3d at 621. Accordingly, the record does not support including the AT&T candidates in the peer group with which Rachells is to be compared.

## 2.  Additional Evidence that Rachells Was Singled Out for Impermissible Reasons

To satisfy the fourth *prima facie* element in a force reduction case, a plaintiff must show "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Geiger*, 579 F.3d at 622.  There are a number of ways that a plaintiff can make this showing.  As this Court has explained in the age discrimination context:

> For example, a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff. Alternatively, a plaintiff could show that the employer made statements indicative of a discriminatory motive. . . .  The guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age.

*Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010) (alterations original) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990)).

Here, among the Cingular candidates, Rachells was the only person of color and the only individual discharged in the RIF.  Given this small sample size of the Cingular candidates, however, this is not sufficient to conclude that Cingular's actions were racially motivated.  *See Schoonmaker*, 595 F.3d at 267 (when considering RIF that eliminate two of five employees, holding that "such a small statistical sample is not probative of discrimination"); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 & n.7

(6th Cir. 1987) (rejecting the departure of seventeen employees as a basis for a statistical argument for discrimination in a force reduction case).

Rachells also presented evidence that he was not informed about what the RIF interview would entail and was not interviewed regarding the "Drive For Results" component of the SISG. A reasonable factfinder could give weight to this evidence and infer that Rachells was not given the same opportunity to prepare and/or to make his case as the other candidates. Although the R&R conceded that this evidence "might suggest that Plaintiff was treated differently," *R&R* at 21, it determined that such evidence "[wa]s not probative of whether this disparate treatment was motivated by race considerations." *Id.* (citing *Geiger*, 579 F. 3d at 622, 625 (employer email suggesting retention of employees based on managers' personal preferences was not evidence of hiring or discharge on account of age)).

While, alone, evidence of aberrations in Rachells' interview might be insufficient to raise a genuine factual dispute as to the fourth *prima facie* element, the district court erred in dismissing two other crucial categories of evidence tending to show race-based discrimination: evidence of Rachells' superior qualifications and evidence of a discriminatory atmosphere at Cingular. When viewed in the aggregate, and in the light most favorable to Rachells, this evidence establishes a genuine question of material fact as to whether Cingular singled out Rachells for discharge because of his race.

### a. Superior Qualifications Evidence

Under the law of this Circuit, Rachells may show that he was singled out for impermissible reasons by establishing he possessed qualifications superior to those of a non-protected candidate who was not discharged. *Schoonmaker*, 595 F.3d at 267 (citing *Barnes*, 896 F.2d at 1466). As evidence of his relative qualifications, Rachells points to the nine awards and/or accolades he received between 1999 and 2003. Rachells also presents evidence that his 2002, 2003, and 2004 attainment percentages exceeded those of his Cingular peers, and that his 2003 performance review was the highest of any of his co-workers. Cingular does not dispute the evidence of Rachells' superlative performance between 1999 and 2003, but argues that Rachells' performance

declined markedly in 2004.  As evidence of this decline, Cingular offers Rachells' poor 2004 performance review and his poor RIF interview score, and his RIF ranking as seventh of nine candidates.  In addition, Cingular contends that Rachells' 2004 compensation evidence is irrelevant because candidates' sales attainment percentages were not among the factors considered in the RIF selection process.

In evaluating the above evidence, the district court correctly determined that the relevant inquiry is Rachells' qualification relative to other candidates at the time of the RIF.  Nevertheless, the district court erred in concluding, as a matter of law, that evidence of Rachells' past performance "do[es] not undercut Defendants' statements regarding his performance in 2004."  *R&R* at 23.  When viewed in the light most favorable to Rachells, evidence of Rachells' many accolades and awards, as well as the fact that he had the best 2003 performance review and the highest 2002, 2003, and 2004 attainment percentages of any of his Cingular peers, could lead a reasonable jury to conclude that Rachells was consistently Cingular's highest-performing employee and remained so in 2004.  Cingular's attempts to dismiss Rachells' superior 2004 attainment percentages as legally irrelevant are unconvincing:  it strains credulity to imagine that the qualifications for a sales position – which, by Cingular's own formulation include "creat[ing] customer loyalty" and "drive for results" – are unrelated to demonstrated sales ability.  Accordingly, a factfinder could infer that Rachells' poor scores in the RIF selection process did not reflect an actual decline in performance, but rather the reviewer's attempt to ensure Rachells was among those discharged in the workforce reduction.[12]  The record therefore reflects a genuine dispute of material fact as to

---

[12] Cingular suggests that such an inference is not reasonable because, by Rachells' own admission, Hart was instrumental in enabling Rachells to remain at the Company during prior reorganizations.  Rachells, however, presents evidence that Hart told him that Fine "ha[d] it out" for Rachells.  Although such evidence is inadmissible hearsay for the purposes of proving that Fine did in fact "have it out" for Rachells, it is admissible to prove the proposition that Hart *believed* that Fine did not want Rachells to remain with Cingular.  Accordingly, viewing the facts in the light most favorable to Rachells, a reasonable jury could infer that Hart acted based on his perception of Fine's preferences.  At the summary judgment stage, the district court was obligated to construe such inferences in Rachells' favor. *Pucci*, 628 F.3d at 759.

whether Rachells possessed qualifications superior to those of a non-protected candidate who was not discharged.[13]

### b. Other Evidence of Race Discrimination at Cingular

The record also contains other evidence probative of whether Rachells was singled out for discharge on the basis of race. In particular, the affidavits of Maribel Jones and Michael Johnson contain evidence of other potentially discriminatory conduct at Cingular, including: Fine's 2003 promotion of Bagshaw to District Manager over arguably more qualified minority applicants; Bagshaw's preferential treatment of white employees in discipline, promotions and evaluations; and Fine's non-responsiveness to Jones and Johnson's complaints that their 2003 evaluations were racially motivated. In a footnote, the R&R struck the affidavits of both Jones and Johnson in their entirety, on the basis that they reflected only the affiants' subjective beliefs and constituted inadmissible hearsay. *R&R* at 25 n.21. In so doing, however, the R&R erred: although portions of the Jones and Johnson affidavits are inadmissible, they also contain relevant, admissible evidence concerning the affiants' personal experience of allegedly discriminatory treatment at Cingular.

Cingular argues that Jones and Johnson's individual work experiences are not relevant to Rachells' claims because Johnson and Jones operated in a different business channel and generally had different co-workers and direct supervisors than did Rachells. This argument ignores, however, that Jones and Johnson's evidence may be probative of whether a discriminatory atmosphere existed at Cingular during Rachells' tenure.

In the context of evaluating evidence of pretext, this Court has explained:

> Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be

---

[13] In so deciding, we do not rely on Rachells' subjective assessment that he was a better salesman or a more popular manager: "a plaintiff's subjective views of his qualifications in relation to other [employees], without more, fails to establish discrimination." *Douglas v. Int'l Auto. Components Grp. N. Am., Inc.*, 483 Fed. Appx. 178, 181 (quoting *Schoonmaker,* 595 F.3d at 269) (alternations original). *See also Mynatt v. Lockheed Martin Energy Sys., Inc*., 271 Fed. Appx. 470, 477 (6th Cir. 2008); *LaGrant v. Gulf & W. Mfg. Co., Inc*., 748 F.2d 1087, 1091 (6th Cir. 1984)).

> conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 392 (6th Cir. 2009) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)). Indeed, "evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." *Id.* (quoting *Ercegovich*, 154 F.3d at 356). Thus, even the conduct of a nondecisionmaker may be probative of whether an adverse action directed at a plaintiff was racially motivated. *Id.*; *see also Bartlett v. Gates*, 421 Fed. Appx. 485, 491 (6th Cir. 2010) ("[D]iscriminatory remarks can . . . also serve as probative evidence of pretext . . . even when remarks are made by a nondecisionmaker."). Moreover, "management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered the decisionmaking process in another context." *Id.* at 394 (quoting *Ercegovich*, 154 F.3d at 356). Factors affecting whether discriminatory atmosphere evidence is probative of discrimination in a particular case include: "the [actor]'s position in the [employer's] hierarchy, the purpose and content of the [conduct], and the temporal connection between the [conduct] and the challenged employment action, as well as whether the [conduct] buttresses other evidence of pretext." *Id.* at 392 (quoting *Ercegovich*, 154 F.3d at 357) (discussing the relevance of discriminatory statements by nondecisionmakers in a pretext analysis).

We first consider the probative value of evidence related to Fine's 2003 promotion of Bagshaw to District Manager. As a threshold matter, Fine's conduct generally is highly probative of the motivations underlying Rachells' termination because he was the top Cleveland official in Cingular's managerial hierarchy and the final decisionmaker in the RIF selection process. *See Bartlett*, 421 Fed. Appx. at 491-92 (discriminatory statements by decisionmakers, weeks before a promotion decision, ostensibly motivated by a desire to hasten plaintiff's departure, are strong probative evidence of pretext). Turning to the purpose and content of Fine's conduct, viewed in

the light most favorable to Rachells, the record contains plausible circumstantial evidence that Fine engaged in racial discrimination in promoting Bagshaw. In particular, the Jones and Johnson affidavits evince that members of a protected class (racial minorities) were denied a promotion for which they were qualified in favor of Bagshaw, a similarly-situated Caucasian male[14] – thereby establishing a *prima facie* case of race discrimination. *See Clay*, 501 F.3d at 704.[15] In addition, the evidence of Bagshaw's poor performance as compared to that of Jones and Johnson[16] "challenges the reasonableness of [Fine's] decision," and thereby arguably demonstrates pretext. *Risch*, 581 F.3d at 391.[17] Therefore, with all inferences construed in Rachells' favor, Rachells has presented evidence that Fine impermissibly considered race in promoting Bagshaw. As discussed above, "management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered the decisionmaking process in another context." *Id.* at 392 (quoting *Ercegovich*, 154 F.3d at 356). Moreover, although Fine promoted Bagshaw in 2003, this event is not so temporally remote from the RIF as to diminish entirely its probative value with respect to Rachells' claims – particularly given Fine's role in the RIF. *Id.* ("[E]vidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with . . . timeframe involved in the specific events that generated a claim of discriminatory treatment.") (quoting *Ercegovich*, 154 F.3d at 356); *see Marsico v. Sears*

---

[14] Although Jones may not have been similarly situated to Bagshaw – given that he was her "direct supervisor" at the time they applied to the position – the record indicates Johnson faces no such legal barrier to establishing a *prima facie* case of discrimination.

[15] To "ma[k]e a prima facie case[,] the plaintiff must demonstrate '"that (1) he [or she] was a member of a protected class; (2) that he [or she] suffered an adverse employment action; (3) that he [or she] was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him [or her].'" *Clay*, 501 F.3d at 703 (quoting *Braithwaite*, 258 F.3d at 493) (alterations original).

[16] Johnson does not say how he learned of Bagshaw's sales numbers, and his testimony as to Bagshaw's poor performance, therefore, raises potential hearsay problems. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992) (explaining that Fed. R. Civ. P. 56(e) "requires that affidavits in support of, or in opposition to, a motion for summary judgment be made on personal knowledge, set forth such facts as would be admissible into evidence and show affirmatively that the affiant is competent to testify to the matters stated therein"). Jones' information, however, arises at least in part out of her personal experience assisting Bagshaw in reaching his sales quotas, and would therefore be admissible.

[17] A plaintiff may "demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Risch*, 581 F.3d at 391 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2380 (2009)).

Case: 12-4137 Document: 004111652460 Filed: 06/17/2013 Page: 20 Case: 1:08-cv-02815-DCN Doc #: 42-1 Filed: 06/24/13 Page 21 of 24. PageID #: 580

*Holding Corp.*, 370 Fed. Appx. 658, 659 (6th Cir. 2010) (summary judgment improper on ADEA claims where, four months prior to an adverse employment decision, employer stated "[y]ou know, you've been around here a long time"). Based on the above, the circumstantial evidence that Fine discriminated in promoting Bagshaw, is highly probative of whether Rachells was the subject of individualized discrimination.

A comparable analysis applies with respect to evidence regarding Fine's response to Jones' and Johnson's attempts to challenge their 2003 performance reviews. If upon receiving multiple complaints of discrimination in performance evaluations, Fine actually "did nothing," this failure to investigate could be construed by a reasonable jury as willful inaction and condonation of such discriminatory conduct. Indeed, given that Jones' and Johnson's inability to get relief from poor reviews led to their respective resignations, a fact finder could infer that Fine's inaction was intended to lead to that result. At minimum, in light of Fine's position at the company, Fine's inaction is probative of whether a discriminatory atmosphere existed in the Cleveland region. Moreover, because Jones' and Johnson's complaints put Fine on notice of potential discrimination in employee evaluations, this evidence is probative of Fine's motives and conduct in approving Rachells' termination on the basis of an inconsistently poor 2004 performance review. Because of the actor and the conduct at issue, evidence of Fine's response to Jones' and Johnson's performance review challenge is not rendered irrelevant simply because those events predated the RIF by a year and a half.

Finally, we examine whether evidence of Bagshaw's allegedly discriminatory conduct is probative of whether Rachells was singled out for discharge on the basis of his race. The content of Bagshaw's alleged conduct – including undeservedly poor evaluations of minority employees, as well as preferential treatment of Caucasian employees in promotions and disciplinary actions – is consistent with that we have previously considered probative of a discriminatory atmosphere. *See Risch*, 581 F.3d at 393-94 (in sex discrimination claim based on failure to promote a female police officer, evidence that "male officers [including two sergeants charged with managing the department] frequently made derogatory or discriminatory remarks about female

officers," and a Lieutenant "who occupied a senior position in the command staff[] discriminated against female officers in distributing work" is probative of a discriminatory atmosphere). As discussed above, evidence related to a pattern of discriminatory evaluations is particularly relevant to Rachells' claims, given Rachells' assertion that he received artificially low scores in the RIF selection process. In addition, though Bagshaw was not himself a decisionmaker with respect to Rachells' termination, evidence of his conduct is probative of the atmosphere affecting Rachells' employment. While Bagshaw did not supervise Rachells, as District Manager, Bagshaw was relatively senior in the Cleveland region's managerial hierarchy. *See Risch*, 581 F.3d at 393 ("Discriminatory statements made by individuals occupying managerial positions can be particularly probative of a discriminatory workplace culture.") (citing *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007); *Ercegovich*, 154 F.3d at 357). Insofar as Fine tolerated Bagshaw's behavior, evidence of Bagshaw's conduct "add[s] 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Risch*, 581 F.3d at 392 (quoting *Ercegovich*, 154 F.3d at 356). Rachells' involvement with Jones and Johnson, and his emails on their behalf, is further evidence that Bagshaw's conduct affected the atmosphere of the Cleveland region generally, and not merely that of the Direct Channel retail stores. Furthermore, because the discriminatory atmosphere described by Jones and Johnson extended at least until July 2004, when Johnson quit his position at Cingular, it is probative of Cingular's decsionmaking processes during the January 2005 RIF. *See Marsico*, 370 Fed. Appx. at 659 (evidence of negative age-related comments four months prior to an adverse employment decision is probative of pretext in ADEA claim).

In presenting evidence of Fine's decision to promote Bagshaw over more qualified minority applicants, Fine's failure to investigate complaints of discriminatory performance evaluations, and other conduct by Bagshaw contributing to a discriminatory atmosphere, as well as evidence that Rachells had superior qualifications to other Cingular candidates retained in the RIF, Rachells has provided "additional evidence" that he was terminated on account of his race, as required by the heightened standard for

workforce reduction cases. *Geiger*, 579 F. 3d at 622 (citing *Barnes*, 896 F.2d at 1465). Accordingly, viewing the evidence in the light most favorable to the non-movant, Rachells has established a *prima facie* case of race discrimination.

### B. *Cingular's Proffered Reason and Pretext*

Once a plaintiff has established a *prima facie* case, under the *McDonnell Douglas* framework, the burden shifts to the employer to offer a nondiscriminatory reason for the plaintiff's discharge. Here, there is no question that Cingular has offered such a reason: the RIF and Rachells' poor performance in the RIF selection process. The burden therefore shifts back to Rachells to "point out 'evidence from which a jury could reasonably reject [Cingular's] explanation'" as pretextual. *Davis*, 717 F.3d at 580 (quoting *Chen,* 580 F.3d at 400).

A plaintiff generally demonstrates pretext by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Id.* (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). The plaintiff may also demonstrate pretext, however, by offering evidence that challenges the reasonableness of the employer's decision, to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. *Risch*, 581 F.3d at 390 (quoting *White*, 533 F.3d at 389-90 ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.")).

The relative qualifications of candidates can establish triable issues of fact as to pretext where "the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.'" *Bartlett*, 421 Fed. Appx. at 490 (citing *Bender*, 455 F.3d at 627–28; *Risch*, 581 F.3d at 391).

Case: 12-4137   Document: 003111624097   Filed: 07/17/2013   Page: 23   (23 of 24)

Accordingly, the above-described evidence of Rachells' superior qualifications and the discriminatory atmosphere at Cingular doubles as evidence from which a jury could find pretext.

With respect to qualifications evidence, the record contains evidence that Rachells received numerous sales accolades and awards between 1999 and 2003, had the best 2003 performance review of any of the Cingular candidates, and had the highest 2002, 2003, and 2004 attainment percentages of any of his Cingular peers. By Cingular's own formulation, the qualifications for the National Account Executive position were measurable by the metrics included in Cingular's annual performance reviews (which rated candidates in the areas of "Drives For Results," "Drives For Strategy," and "Maximizes Talent") and the SISG factors (which included "Create Customer Loyalty," "Drive For Results," and "Use Sound Judgment"). Given Rachells' earlier top performance on Cingular's annual review metrics, and the evidence that Rachells' annualized sales attainment percentage actually increased from 2003 to 2004, a reasonable jury could conclude that Hart gave Rachells an undeservedly poor review to create pretext for his discharge. A factfinder could further conclude that, in 2004, Rachells was as qualified, if not more qualified, than his fellow applicants with respect to the annual review metrics. Moreover, given the inherent correlations between the SISG factors and demonstrated sales ability, a reasonable factfinder could likewise conclude that Rachells was as qualified, if not more qualified, with respect to the metrics ostensibly measured in the RIF interview. The record, therefore, reflects a genuine dispute of material fact as to Rachells' qualifications relative to those of other candidates.

The record also reflects other evidence that a discriminatory atmosphere existed in Cingular's Cleveland region. Specifically, the Jones and Johnson affidavits contain admissible evidence that, construed in the light most favorable to Rachells, tends to show that: Fine promoted Bagshaw to District Manager over more qualified minority candidates; Bagshaw gave undeservedly poor evaluations to minority employees, as well as preferential treatment in promotions and disciplinary actions to white employees;

and Fine was nonresponsive to minority employees' complaints about discriminatory performance reviews. For the reasons discussed at length above, such evidence is probative of individualized discrimination in the case of Rachells' termination, because it "add[s] 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Risch*, 581 F.3d at 392 (quoting *Ercegovich*, 154 F.3d at 356). Furthermore, "management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered the decisionmaking process in another context." *Id.* at 394 (quoting *Ercegovich*, 154 F.3d at 356). Accordingly, this evidence is probative of pretext "because [it] cast[s] doubt on the basis in fact of Defendant's proffered legitimate, non-discriminatory reasons." *Bartlett*, 421 Fed. Appx. at 492 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008)).

Based on the above, Rachells has presented sufficient evidence to raise a genuine question of material fact as to pretext. We conclude, therefore, that the district court erred in granting summary judgment to Cingular on Rachells' race discrimination claims.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the District Court's grant of summary judgment for Cingular, and **REMAND** for further proceedings consistent with this opinion.